SAMUEL A. WHITE, WILLIAM M. COOKE, CHAMBERS ETLER, JOHN H. BALDWIN, HENRY J. HUCK, AS ADMINISTRATOR OF HERMAN H. RODGERS, AND IN HIS OWN RIGHT, JOHN P. O'BRIEN, OLIVER H. STAPP, AND THOMAS ROOKE, PLAINTIFFS IN ERROR, *v.* ALBERT T. BURNLEY.

20h 235
L-ed 886
20h 272
11wa667
11wa670
96 299
46f 231

In the present case, the land granted in Texas was alleged to be within the *empresario* contract of De Leon. After proof that many of the documents upon the subject were destroyed in the revolution, the court left it to the jury to decide whether or not the land was thus situated. This ruling was correct.

The fact that the surveyor included more land than was called for, does not avoid the grant. Whatever the State might do to annul it, third parties have no right to consider it void.

A grantee having been compelled to leave Texas, there was no evidence of his voluntary and final abandonment of the country. As there was no evidence. the jury could not express an opinion upon the subject.

Nor was there any evidence which would justify the court in leaving it to the jury to decide whether or not this grantee was an alien enemy when he made a conveyance, he being then a resident of Louisiana. The mere fact of his being a Spaniard was not sufficient for an inference that he was an enemy of Texas. The averment in the deed that he was a citizen of Mexico was not sufficient.

Where a deed of land in Texas was executed in Louisiana, and recorded in a notary's books, a copy of it which had been compared with the original by a witness who was acquainted with the handwriting of the notary (being dead) and the subscribing witness, was properly admitted in evidence. It was also admitted as a record of another State.

In order that the statute of limitations shall begin to run, the defendant, claiming under a younger title to land which conflicts in part with an elder title, should have been in actual possession of the part which was overlapped by the elder title.

THIS case was brought up, by writ of error, from the District Court of the United States for the district of Texas.

It was an action of trespass, to try title brought by Burnley against the plaintiffs in error, in the District Court of the United States for the district of Texas, to recover a league of land, situated in Calhoun county, of that State.

Upon the trial, Burnley traced his title in this manner:

1. A document purporting to be the original *testimonio*, in Spanish, of a colonial grant in the colony of Martin De Leon, made by Fernando De Leon, commissioner, to one Benito Morales. The date of it was 11th April, 1835.

2. A deed from Benito Morales to Leonardo Manso, dated 27th May, 1835.

3. Conveyance from Manso to Peter W. Grayson, dated 6th April, 1836. This deed was executed in the parish of St. Landry, Louisiana, before Pierre Labiche, a notary of that place.

4. Conveyance from the executors of Grayson to Burnley and Jones, dated 22d of May, 1844.

The second and fourth of these deeds were given in evidence without objection. The first and third were objected to.

The objection to the original grant constituted the subject of the first bill of exceptions. The defendants, by their counsel, objected to its admission, on the ground that the want of authority in the commissioner of the colony to make the grant, appears upon the face of the grant itself, viz: that it appears therein that it includes more than one *sitio* or league of land, which was the limit of his authority; and thereupon, the court expressing a willingness to hear testimony as to law and usage on this subject, evidence was produced on both sides, when the court allowed the grant to be read in evidence to the jury. To this ruling the defendants excepted.

The plaintiff then proceeded with the deduction of his title, and read the deed from Morales to Manso, without objection. The next step in his title was the deed from Manso to Grayson, which was executed in Louisiana. What was offered in evidence purported to be a copy taken from a notary's books, and began in this way:

"Be it known that this day, before me, Pierre Labiche, notary public in and for the parish of St. Landry, duly commissioned and sworn, personally came and appeared Leonardo Manso, *citizen of the Republic of Mexico,* who declared," &c., &c. This deed was certified in such a manner as to induce the counsel for the defendants to agree as follows:

"I admit the sufficiency of the certificates to the foregoing deed as conformably to the act of Congress, March 27th, 1804, waiving want of notary's seal, &c.; but do not admit that the deed could be certified under that law.

"GEORGE W. PASCHALL,
"ALLEN S. HALE,
"*Attorneys for Reuss S. Bendewald.*"

There was also offered the deposition of a witness that he had examined the deed on file, a certified copy of which was paraphed by him; that he was acquainted with the notary's handwriting, &c., &c.

To the admission of which copy of said deed of conveyance the defendants by their counsel objected, on the following grounds, that is to say—

*First.* Because it was not executed in accordance with the then existing law of Texas in this, to wit:

1. That it did not appear that it was executed before any notary or other officer authorized by law to take and authenticate public instruments.

2. That it does not appear that the foreign notary, before whom it purports to have been passed and executed, made out

and delivered to the interested party at the time a *testimonio*, or second original, as by the then existing law was required.

*Secondly.* Because the protocol or first original should be produced, or satisfactorily accounted for, before said copy, which is secondary evidence, can be admitted.

*Thirdly.* Because, if any *testimonio* or second original was ever in fact issued, its absence is not accounted for.

*Fourthly.* Because the showing that the protocol, or first original, is in the office of a notary in the parish of St. Landry, in the State of Louisiana, is not satisfactorily accounting for the non-production of the original.

*Fifthly.* Because the notary's office in the State of Louisiana is not, *quoad* the original paper, a public office within the meaning of the act of Congress of March 27, 1804, entitled "An act supplementary to an act entitled 'An act to prescribe the mode in which the public acts, records, and judicial proceedings, in each State, shall be authenticated, so as to take effect in every other State.'"

*Sixthly.* Because the notary's office in the State of Louisiana is not, *quoad* the original paper, a public office within the true intent and meaning of the rule of the common law.

*Seventhly.* Because it is not proven in accordance with the rule and principle of the common law, in this, to wit:

1. That the witness, Guy H. Bell, does not prove that it is an examined copy, compared by him with the original.

2. That the witness, Guy H. Bell, does not state his means of knowledge of the handwriting of the witness, John Simons, nor that he was acquainted with his handwriting.

3. That the said witness, Guy H. Bell, does not state his means of knowledge of the handwriting of Pierre Labiche, the notary; and

4. That all proof relating to the handwriting of the notary, Pierre Labiche, is irrelevant, inasmuch as he was not an instrumental, assisting, or subscribing witness, to said original paper.

*Eighthly.* And to the deed itself it was further objected, that it has neither instrumental nor assisting witnesses, as by the law of Texas, in force at the time, was required.

*Ninthly.* That the deed of conveyance shows upon its face that it was executed upon the 6th of April, in the year 1836, by Leonardo Manso, reciting therein that he was a citizen of the Republic of Mexico, to Peter W. Grayson, reciting therein that he was a citizen of Texas, late a portion of said Republic of Mexico; and the fact being judicially known to the court that said Republic of Mexico and said Republic of Texas were then engaged in an open and public war with each other, the said deed of conveyance was and is therefore void.

But the court allowed the deed to be read, and this constituted the defendant's second bill of exception.

The plaintiff then, proceeding with his title, proved the will of Peter W. Grayson, deceased, with the probate thereof, and the grant of letters testamentary to the executors, who conveyed to Burnley and Jones the undivided three-fourths interest in and to all the lands conveyed by Leonardo Manso to Grayson. A deed from Jones to Burnley completed the plaintiff's title.

The third bill of exception by the defendant related to the introduction of certain depositions *de bene esse* by the plaintiff, which need not be further noticed.

The plaintiff then rested.

The defendants then offered a vast mass of evidence, which it is impossible to specify minutely. Their line of defence was this:

1. That the grant contained within its alleged boundaries a much greater amount of land than the grant called for, viz: fifty millions and upwards of square varas, being over two leagues, instead of one; and that there was not over a *laber* of marsh and water on the tract.

2. That the *empresario* De Leon had no right to grant the *locus in quo*, because it was not within the jurisdiction of his *empresa*, and because he, De Leon, had never had the consent of the Federal Executive to his colonizing the coast leagues. Upon this point, the plaintiff offered rebutting evidence.

3. That White had resided upon his own head right ever since 1842, had laid off a town there, and the other defendants held under him.

The defendants offered other matters in defence, which will be sufficiently explained by the rulings of the court below upon those points which formed the basis of the decision of this court. There were twenty-nine prayers made to the court by the counsel for the plaintiff, all of which were granted; twenty-four prayers by the counsel for the defendants, which were refused, and nine instructions given to the jury by the court, at the instance of the defendants. Instead of inserting all this voluminous matter, the reporter prefers to take up in succession the points decided by this court, and to show what were the rulings of the court below or refusals upon those points.

The first proposition decided by this court is the following, viz:

"The land granted was alleged to be within the *empresario* contract of De Leon. After proof that many of the documents

upon the subject were destroyed in the revolution, the court left it to the jury to decide whether or not the land was thus situated.    This ruling was correct."

Upon this point, the rulings of the court below were as follows:

The court refused the following instructions, asked by the defendants, viz:

3d. That the official acts of the various authorities of Coahuila and Texas, and of the Vice President of Mexico, show that the controversy between Power and Hewetson and De Leon, as *empresarios*, only related to such conflict as existed between the calls of their respective grants, between the Nueces and Lavaca rivers, and the documents showing the decisions of the respective Governments in relation to their controversy being Alaman's dispatch of December 23d, 1831, and Letona's dispatch of March 10th, 1832, are to be understood in no other way than as intending to place De Leon in possession of such lands as were embraced within his two contracts, (the first of the date of April 18th, 1824, the other his augmentation contract of April 30th, 1829,) and said dispatches and the law did not authorize the political chief of the department of Bexar to enlarge or extend those grants, or embrace within De Leon's colony any portion of the coast leagues not properly embraced within his said contracts; and any putting De Leon in possession beyond this, would have been without authority, and would not change or enlarge the true boundaries of De Leon's *empresa.*

4th. That after the national colonization decree of August 18th, 1824, and the State colonization decree of March 24th, 1825, and the instructions to the commissioners of the 4th September, 1827, the State had no right to extend to De Leon the right to colonize any portion of the coast leagues without the previous consent of the Federal Executive of Mexico, nor could the commissioners of colonies give possession to any colonist settled, or intending to settle, within the ten littoral leagues, unless the persons interested had presented the commissioner a special order of Government, wherein the approbation of the National Government to such grant had been manifested. And thereupon, if the jury believe, from the evidence, that De Leon had not the consent of the Federal Executive to colonize below the calls of his grant of 1824, as defined by himself in his letter of February 1st, 1825, and agreed to by the Government of Coahuila and Texas, and as shown by the decree of said Government through Gonzales on the 6th of October, 1825, do not embrace the lands in controversy, then there was no authority in the commissioner to make the grant, unless the

plaintiff has affirmatively proven a special order of the Government, wherein the approbation of the National Government to make the grant had been manifested; and in the absence of such proof, the jury will find for the defendant.

5th. That the report of the Government of Coahuila and Texas transmitted to the President of Mexico, dated October 2d, 1826, in which it is stated that the littoral leagues lying between the Guadalupe and Lavaca rivers were vacant, is *prima facie* evidence of the truth, and the contrary can only be established by proving that the lands so comprehended were the property of individuals, corporations, or towns not subject to colonization.

6th. That the consent of the Republic of Mexico in favor of Power and Hewetson's colonizing said littoral leagues between the Guadalupe and Lavaca rivers, expressed in his dispatch of the 22d April, 1828, and the contract between Power and Hewetson, and the Government of Coahuila and Texas on the 11th of June, 1828, gave to Power and Hewetson the legal and exclusive right to colonize said lands, except so far as they were already the property of individuals, corporations, or towns. And if De Leon's contract of 18th April, 1824, conflicted with any portion of said lands embraced within Power and Hewetson's contract of April 22d, 1828, the law only gave him preference to the extent of said conflict, and the political chief of the Department of Bexar could not divest Power and Hewetson's right beyond this conflict, nor vest it in De Leon. And therefore it will be the duty of the jury to ascertain from the evidence the lower boundary of De Leon's contract or grant of 1824; and if they find that the land in controversy was below said lower line, then there was no power in the commissioner of De Leon's colony to make the grant, and they must find for the defendants.

But the court gave the following instructions asked by the defendants, viz:

1. That if the jury believe, from the evidence, that the land in controversy was not embraced within the boundaries of Martin De Leon's colonial contracts of April 18th, 1824, or of his augmentation contract of April 30th, 1829, then there was no authority in the commissioner of De Leon's colony to extend the title, and it is null and void.

2. That, in determining the boundaries specified in these contracts, the jury will examine the calls in said contracts and documents themselves, and then determine for themselves whether the witnesses acquainted with the calls in the grants proved that the land in controversy was without these boundaries; and if so, then they will find for the defendants.

3. That the evidence of the witnesses as to the acts of the political chief of Bexar can only be understood as proving such acts as he could lawfully do; but in so far as it proves acts beyond the authority transmitted to him, and the law arising out of the documentary evidence before the jury, such evidence is to be disregarded.

The court also gave the following instruction asked by the plaintiff:

7th. That if the jury believe from the evidence that there was a controversy between the *empresarios* Power and Hewetson on one side, and Martin De Leon on the other, each claiming a grant including the land in controversy, and that this controversy was decided by the Supreme Executive of Mexico in favor of De Leon, and that decision was carried into effect by the authorities of the State of Coahuila and Texas, and thereby a boundary assigned to the colony of De Leon which included the land herein sued for, such settlement of the controversy will be received as binding and conclusive, and the grant claimed by plaintiff cannot be held invalid, either for want of the approval of the Supreme Executive authority of Mexico, or as being without the jurisdiction of De Leon's colony.

The second proposition decided by this court was this:

"The fact that the surveyor included more land than was called for, does not avoid the grant. Whatever the State might do to annul it, third parties have no right to consider it void."

Upon this point, the defendants prayed the court to instruct the jury as follows:

1. That the colonization laws of Coahuila and Texas did not authorize the commissioner of De Leon's colony to extend to Benito Morales a title for more than one league of land, (a league being twenty-five millions of square varas;) and the title being upon its face for fifty millions square varas, it was from the beginning null and void, and gives no right to recover.

2. That even if there was authority of law to include the excess of twenty-five millions square varas in the area, and exclude it from the computation because such excess was covered with salt bays as expressed in the grant, yet if the jury believed from the evidence that the reasons were false, and that there was in fact a great excess of land (over and above twenty-five millions square varas) which was not covered with water or salt bays, the grant was void because of the excess, and the jury will find for the defendants.

But the court refused to give these instructions, and gave

to the jury the following instructions, at the instance of the plaintiff:

1. That at the date of the grant under which plaintiff claims, both by the general law and the colonization law, saline bays, extending from the gulf or the large bays, could not properly be included in a grant to a colonist, such bays, though embraced in the lines of the survey, would properly have been deducted from the computation of the area of the grant, and the plaintiff's grant on its face is not invalid on that account.

2. The statement made in the survey contained in plaintiff's grant, that half of the survey was covered with saline bays, is *prima facie* to be taken as true at that time.

3. Any change which may have taken place since in the country included in the lines of the survey, will not affect the validity of the grant.

4. Although the jury should believe that the grant when surveyed did not contain an entire league covered by saline bays, yet if they believe that the statement in the survey was caused by the mistake or neglect of the surveyor, it will not vitiate the grant; and in order to render the grant invalid on this ground, the jury must believe from the evidence that there was intentional fraud committed by Benito Morales, the grantee.

The third proposition decided by this court is this:

"A grantee having been compelled to leave Texas, there was no evidence of his voluntary and final abandonment of the country. As there was no evidence, the jury could not express an opinion upon the subject."

Upon this point, the court instructed the jury as follows, at the request of the plaintiff:

11th. That if the jury believe from the evidence that Leonardo Manso was a native Spaniard, who emigrated to Mexico in his youth, and before the revolution by which Mexico was separated from Spain, and adhered to the cause of Mexican independence, and became a citizen of the Republic of Mexico, and then emigrated to and acquired the land in controversy in De Leon's colony, in order that there should have been an *ipso facto* forfeiture of said land, on the ground of abandonment of the country by said Manso, under the colonization law, it must be proved, to the satisfaction of the jury, that prior to the declaration of independence of Texas, on the 2d of March, 1836, the said Manso abandoned and left the country, and became domiciliated in a foreign country, without the intention of returning to Texas, or any other part of Mexico; and if his leaving the country was intended to be temporary, and with the design of continuing his allegiance as a Mexican citizen, and

returning either to Texas or some other part of Mexico, it was no abandonment of the country within the meaning of colonization laws, and did not divest his right to his land.

12th. If the jury believe from the evidence that Manso was forced to leave the country by the public authorities, on account of his being a Gauchapin, and his doing so was not voluntary, it was no abandonment of the country within the meaning of the colonization laws, and did not divest his right to his land.

13th. That the burden of proof is on the defendants, to show a final and complete abandonment of Mexico, prior to the 2d of March, 1836, on the part of Manso, in order that an *ipso facto* forfeiture of his land under the colonization laws should be made out, and the facts on which it is sought to disfranchise a party, and to divest his title to property, ought to be clearly and conclusively established.

The fourth proposition decided by this court was this:

"Nor was there any evidence which would justify the court in leaving it to the jury to decide whether or not this grantee was an alien enemy when he made a conveyance, he being then a resident of Louisiana. The mere fact of his being a Spaniard was not sufficient for an inference that he was an enemy of Texas. The averment in the deed that he was a citizen of Mexico was not sufficient."

The ruling of the court below upon this point was follows:

The following instructions were asked by the defendants' counsel:

7th. It appearing on the face of the conveyance from Leonardo Manso to Peter W. Grayson, that it was made on the 6th day of April, A. D. 1836, between the said Manso, a citizen of the Republic of Mexico, and the said Grayson, a citizen of the Republic of Texas, the States of Mexico and Texas being then engaged in an open and public war with each other, the said conveyance is absolutely null and void, and passed no right of property from the grantor to the grantee therein.

8th. That the contract being in relation to land between citizens of countries then at war with each other, the fact that it was made in the United States, a neutral country, does not take the case out of the rule, but it draws after it all the consequences of the laws of war, and is as void as though it had been made in Texas or Mexico.

9th. That the sale from Manso to Grayson being, as expressed in the deed, between citizens of Mexico and Texas, countries then at war with each other, the contract was contrary to the laws of war governing belligerents, was forbidden by the organic law of Texas, the criminal law of England

which it had adopted, its public policy, good morals, and the duty of Grayson as a citizen of Texas, and was therefore void.

11th. That if Manso had resided in Texas when the revolution commenced, in 1835, he had the right to make his election, whether he would adhere to his allegiance to Mexico, or adopt the new State of Texas; and the fact of his election is to be determined by his subsequent acts of declaring in the deed that he was a citizen of Mexico, and by his soon after returning to Mexico, and residing permanently there.

12th. That Grayson and those claiming under him in privity of estate, are estopped by the recitals of citizenship in the deed; and no proof of temporary residence in a neutral country, even if it had been made, could be allowed to contradict their own solemn act.

But the court refused to give these instructions, and gave the two following sets, the first being asked by the defendants, and the second by the plaintiffs:

The defendants asked the following, which were granted:

4th. It appearing on the face of the conveyance from Leonardo Manso to Peter W. Grayson, that it was made on the 6th day of April, A. D. 1836, between the said Manso, a citizen of the Republic of Mexico, and the said Grayson, a citizen of the Republic of Texas, the said States of Mexico and Texas being then engaged in open and public war with each other, the said deed of conveyance is absolutely null and void, passed no right of property from the grantor to the grantee therein, unless the jury should find from the evidence that the said Leonardo Manso was, at the time of making said conveyance, domiciled in the State of Louisiana, where said conveyance was executed.

5th. That to constitute a domicil requires an union, or joint operation of act and intention, residence in a particular place with the design of remaining there permanently. In attaining a just conclusion on the question of domicil, the chief point to be considered is the intention to remain in the particular place or country; if it sufficiently appears from the evidence that the said intention of removing from one place to another was to make a permanent settlement at the latter place, or for an indefinite time, that is, without looking to a departure from thence at any future time, when any particular business shall have been accomplished, the person may then be said to be domiciled in the country or place where he is residing; unless, therefore, the jury find from the evidence that Leonardo Manso was residing in the State of Louisiana on the 6th of April, 1836, with the intention to remain there permanently, or for an indefinite time, as above explained, he cannot be said to

have been at the time domiciled in Louisiana so as to render the conveyance made by him on that day to Peter W. Grayson, a citizen of Texas, legal and valid.

And the plaintiff asked the following, which were granted:

8th. That if the jury believe from the evidence that Leonardo Manso was a native Spaniard, who emigrated to Mexico in his youth, and before the revolution by which Mexico was separated from Spain, and adhered to the cause of Mexican independence, and became a citizen of the Republic of Mexico, and in the year 1833, or before that time, emigrated to Martin De Leon's colony in Texas, settled in said colony, was received as a colonist and domiciliated therein, and thenceforward until the date of this conveyance remained either in Texas or in Louisiana, without having re-established his domicil in any other part of Mexico, then the said Leonardo Manso was not, up to the date of said deed, an alien enemy to Texas, and his deed to Grayson is not invalid on that ground.

9th. That if Manso's domicil, at the date of his conveyance to Grayson, was either in Texas or Louisiana, and the jury do not believe from the evidence that he had taken up arms or engaged in the contest against Texas, his mere election to consider and calling himself a citizen of Mexico, would not make him an alien enemy, so as to render his said deed invalid on that ground.

The fifth proposition decided by this court is the following:

"Where a deed of land in Texas was executed in Louisiana, and recorded in a notary's books, a copy of it which had been compared with the original by a witness who was acquainted with the handwriting of the notary (being dead) and the subscribing witness, was properly admitted in evidence. It was also admitted as a record of another State."

The ruling of the court below upon this point was as follows:

The plaintiff asked the court to give the following instructions to the jury, which the court gave, viz:

16th. The conveyance from Manso to Grayson, executed in Louisiana before a notary public in conformity to the law prevailing in civil law countries, does not require further proof of delivery to the party, as the making the agreement before a notary, its reduction to writing, and making a protocol of such writing, includes delivery.

17th. If the jury find from the evidence that the deed from Manso to Grayson was made in Louisiana before a notary public, and was executed by the parties, and left with him to become a record of his office, further evidence of the delivery of the said deed is not necessary.

The last proposition decided by this court was the following:

"In order that the statute of limitations shall begin to run, the defendant, claiming under a younger title to land which conflicts in part with an elder title, should have been in actual possession of the part which was overlapped by the elder title."

Upon this point the court below gave the following instruction to the jury, at the request of the plaintiff.

18th. Though White, and those claiming under him, may have had more than three years' adverse possession on his third of a league claimed in this action, yet if said third of a league survey conflicted in part only with plaintiff's grant, and there was not an actual adverse possession within the interference of the surveys for three years or more before the commencement of this action, the defendants will not be entitled to the bar of the fifteenth section of the act of limitations.

The verdict and judgment were for the plaintiff, and the defendants brought the case to this court by writ of error.

It was submitted on printed argument by *Mr. Reagan* for the plaintiffs in error, and argued by *Mr. Bibb* and *Mr. Hughes* for the defendants. There was also upon that side a brief filed by *Mr. Ballinger.*

The analysis of the rulings of the court below has occupied so much room, that the points and arguments of counsel must be omitted.

Mr. Justice CATRON delivered the opinion of the court.

This suit was brought and tried in the District Court of Texas, to recover a league of land lying in that State, fronting in part on Matagorda bay, east of the mouth of the Guadalupe river, and purporting to be in Martin De Leon's colony or *empresa.*

1. The first objection made on the trial, was to the introduction of the grant offered in evidence, on the ground that the land did not lie in the colony, and therefore the officers of the same wanted jurisdiction, and had no power to grant to Benito Morales, under whom Burnley claims. If the premises were true, the conclusion would certainly follow. (McLemore *v.* Wright, 2 Yerger's Ten. R.)

It is a historical fact, established as such by the decision of the Supreme Court of Texas, in the case of De Leon *v.* White, (9 Texas R., 598,) that the *empresario* contract of Martin De Leon was so amended by order of the General Government of Mexico as to include the littoral leagues along the coast of the Mexican gulf, including that portion thereof where the land in dispute lies.

It is not only established by the history of the country; but

here, it was also proved by witnesses, after proof had been made to the court, that many of the documents of the *empresa* had been destroyed by the soldiers of the Texas army during the revolutionary struggle. The court left it to the jury to determine whether the land lay in the *empresa* of Martin De Leon, and they so found. In doing this, we think there was no error committed as against the defendant.

2. The next question appears on the face of the grant. All the steps leading to the grant, with one exception, are regular.

The quantity of land that the lines of survey include, is equal to two leagues, whereas only one league is called for; and the reason the surveyor gives in his certificate of survey for the excess is, that he included in the survey a bay of the ocean, which was not subject to grant, a quantity equal to a league.

This statement was proved to be untrue—almost entirely. The grant contains two leagues and more of fast land; and for this reason it was insisted at the trial that it was fraudulent and void. But the court charged the jury to the contrary, with several qualifications. These we deem to have been useless; as our opinion is, that a regular grant (that is, a completed title, made by those exercising the proper political power to grant lands) is not open to this objection, by an opposing claimant setting up a younger title; and we understand, that on this principle the well-considered cases of Hancock *v.* McKinney, (7 Texas,) and of Swift *v.* Herrera, (9 Texas,) proceed. Such is the settled doctrine elsewhere. (Overton *v.* Campbell, 5 Hayw. Ten. R.)

How far the Government of Texas might interefere by "due course of law," (that is, by a suit in its name and behalf,) is a question for that Government to decide. Owen *v.* Rains's Lessee (5 Haywood's Ten. R., 106) is to the effect that it can only be done by suit.

To hold that this grant was *void*, because the surveyor returned an excess in his survey, without any evidence that the grantee participated in the matter, as is the case here, would be an alarming doctrine through a wide-spread portion of the United States. No instance is recollected where the State has interfered by suit to reform a land patent for excess of quantity. The consideration of more or less of excess, to constitute a *prima facie* case of fraud, would give a latitude of discretion to the judicial department over the executive and granting power, inconsistent with the independence of the latter in this branch of administration. Under the Spanish and Mexican Governments, the judiciary had no authority to interfere at all in any case. The political department retained to itself all the power to reform or to annul titles.

But where the executive authority intervenes, and calls on the courts of justice to aid "in the due course of law," no collision between the two departments can occur.

That a case of excess sufficiently gross could arise to justify a proceeding by suit on the part of the State of Texas, to reform a Spanish grant, we do not doubt. (United States *v.* Hughes, 11 How., 552.) But the question here is not of reform; it is of original nullity.

What was the condition of Morales's title? He applied for a league of land as a colonist; his petition was granted, and a survey ordered. The surveyor made return of his survey to the commissioner, who in effect exercised the granting power in De Leon's colony. The lines of the survey call for other adjoining tracts, and their corners previously made. On the faith of this survey, the commissioner proceeded to extend the title to Morales. It is probable that no actual survey was made on the ground; and hence it happened that the surveyor's certificate stated that more than one-half of the boundary shown on the plat was covered by water, and not subject to grant. Of this matter, the surveyor and the commissioner, as the judge of land distribution, had jurisdiction; it was their duty to act justly between the Government and the grantee. The commissioner acted by extending the title of possession, and thus vested a full title in Morales. No one at that time had any right to complain, if the Government was content; it has so far acquiesced, and younger grantees are bound by that acquiescence.

There is not the slightest evidence that Morales had any knowledge that the statement made by the surveyor in his certificate of survey was untrue; and therefore the grant as to him is not *void*, and could only be voidable in part, if it could be reformed at all.

3. Morales conveyed to Manso, who was a citizen of Texas, residing in De Leon's colony when resistance to the Central Government of Mexico was first agitated by the inhabitants of Texas.

All Spaniards were ordered to leave the country by the party which eventually proved successful; and Manso, being a Spaniard, left and went to Louisiana; and it is insisted that this forced removal was an abandonment of the country, and a forfeiture of his land, according to the colonization laws of Coahuila and Texas. Manso took no part in the revolutionary movement, quietly left, and resided in Louisiana from the fall of 1834 up to the time when he conveyed to Grayson, in April, 1836. Such was the only proof of his acts, so far as they affect this controversy.

The evidence did not warrant any charge from the court on the ground of abandonment of the country by Manso. The case of Hardy *v.* De Leon (5 Texas R.) is conclusive on this ground of defence. To hold otherwise, would violate the entire doctrine laid down in the case of McMullin *v.* Hodge, (5 Texas R.)

There must be *some* evidence on which a charge to the jury is founded, otherwise it cannot be lawfully given. As there was no evidence from which an abandonment could be found by the jury, an instruction on the subject could only mislead. (Chirac et al. *v.* Reinecka, 2 Pet., 625.)

In the next place, we are of the opinion that there was no evidence introduced on the trial below which could have warranted the court to give any instruction to the jury destructive of Grayson's title, on the supposition that Manso was an alien enemy at the time of conveying, and therefore had no capacity to convey.

When one nation is at war with another nation, all the subjects or citizens of the one are deemed in hostility to the subjects or citizens of the other; they are personally at war with each other, and have no capacity to contract. Here Manso was a citizen of Coahuila and Texas, when he was forced to leave his country, and continued away, subject to the same coercion, until after independence was declared by Texas, March 2d, 1836. The Constitution of Texas was adopted March 17th, 1836; by the tenth section of which it is provided, that "all persons (Africans, &c., excepted) who were residing in Texas on the day of the declaration of independence shall be considered citizens of the Republic, and entitled to all the privileges of such." Manso conveyed to Grayson in April, afterwards. There was a *suspicion* (he being a Spaniard) that he sympathized with the federal authorities of Mexico, and *might* take sides with the enemies of Texas; but this record affords no proof that he did so, up to the time when he conveyed to Grayson; nor is there any proof showing that he had abandoned his domicil in Texas, which he was forced to leave some sixteen months before independence was declared; nor is it of any consequence, whether he did, or did not, become domiciled in Louisiana, if he was not an alien enemy to the Republic of Texas, and to her citizen Grayson, the grantee; as an alien friend can convey his lands situate in a foreign Government; and that the title is defeasible, is nothing to the purpose in this case.

It is again insisted that Manso, after he conveyed to Grayson, removed to Mexico, and that this must be taken as evidence that he was an alien enemy when independence was

declared. The Texas courts hold that forcing a party to leave the country should not operate to his prejudice. (Hardy *v.* De Leon, 5 Tex. R.) And this court held, in the case of McIlvane *v.* Coxe's lessee, (4 Cra., 216,) that a citizen of New Jersey did not forfeit his citizenship by joining the British army during our revolutionary war, and that his heirs took by descent, although their ancestor continued to reside abroad. Nor did the expression in the deed that Manso was a citizen of Mexico *establish* alienage, as the State might claim his citizenship, notwithstanding. To this effect is Coxe's case; and which is followed by the doctrine maintained in Ingle *v.* The Trustees of the Sailors' Snug Harbor. (3 Peters R.)

4. The conveyance from Manso to Grayson is dated April 6, 1836, and was executed before a notary public in Louisiana. It embraced seventeen leagues in all, including the one in dispute. It was a civil-law conveyance, made in a notary's book, and a copy furnished to the grantee, as a second original. This copy was offered in evidence. In December, 1836, the Legislature of Texas enacted, that "the common law of England, as now practiced and understood, shall, in its application to juries and evidence, be followed and practiced by the courts of this Republic." The conveyance had two attesting witnesses to it, besides the signature of the notary. To let in the copy, it was proved by a witness that he had examined the original on file on the notary's book; that the copy was a true one; that the notary before whom the conveyance was executed was dead; that the witness knew his handwriting, which was genuine; that he, the witness, was well acquainted with the handwriting of John Simonds, one of the subscribing witnesses to the act of sale, who was also dead, and that the signature of Simonds was genuine.

The original of the conveyance from Manso to Grayson remained in the archives of the notary in Louisiana, and consequently could not be produced, and the copy was of necessity offered. This is according to the case of Watrous *v.* McGrew, (16 Tex. R., 512.) We are of opinion that the paper offered was sufficiently proved to be admitted on common-law principles.

The copy from the notary's books was also duly authenticated, according to the act of Congress of 1804, as a record of another State. The Supreme Court of Texas held, in the case of Watrous *v.* McGrew, that as the sixth article of the Constitution of Texas of November, 1835, creating a provisional Government, had recognised the civil code and code of practice of Louisiana; and as the ordinance of January 22, 1836, (Hart. Dig., 321,) had adopted, "in matters of probate the laws and principles in similar cases in the State of Louisiana," the

courts of Texas must recognise the Louisiana laws, and the proceedings under them, in cases of conveyances executed by notarial act in Louisiana; and on this ground the copy of the conveyance then before the court was admitted in evidence, being in all its features a copy of a record like the present.

5. The remaining question is, whether the defendants are protected by the act of limitations of three years? They pleaded, specially, that they, and those under whom they claim, have been in *adverse* possession of the premises sued for under color of title for three years next before the commencement of this suit; and that the plaintiff's cause of action accrued more than three years next before the commencement of said suit.

The fifteenth section of the act of 1841 (Hart. Dig., 729) declares that every suit to recover real estate as against any one in possession under title, or color of title, shall be instituted within three years next after *the cause of action* shall have accrued, and not afterwards.

The defendants had both title and color of title, as required by the act; and they, or some of them, had been in actual possession of their lands more than three years before this suit was commenced.

The younger title, owned and occupied by the defendants, lapped over one side of the grant to Morales, and to this interference the dispute extends. But no one of the defendants had been in actual possession of the disputed part for three years when the suit was brought.

The act of 1841, section 15, requires suit to be instituted within three years "next after the cause of action shall have accrued." And we think it too plain for reasoning or authority to make it plainer, that, until the land of the plaintiff was trespassed upon, this action of *trespass,* to try title, could not be maintained. Such are the decisions of the elder States on statutes having corresponding provisions. (Trimble *v.* Smith, 4 Bibb Ky.; Pogue *v.* McKee, 3 Mar. Ky.; Talbot *v.* McGavock, 1 Yer. Ten. R., 262.)

We have endeavored carefully to follow the doctrines of the Supreme Court of Texas in this opinion, because we are bound to follow the settled adjudications of that State in cases affecting titles to lands there.

On the effect *of excess of quantity* in a grant, and on the three years' act of limitations, we had no direct guide, and therefore have expressed our independent views on these questions.

For the reasons here stated, it is ordered that the judgment of the District Court be affirmed.

Mr. Justice DANIEL dissented.